IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TONCA WATTERS, ) | |
| TERENCE WATTERS, ) | |
|     Plaintiffs, ) | |
| ) | |
| vs. ) | CASE NO.:  1:18-cv-270 |
| ) | |
| THE HOMEOWNERS ASSOCIATION AT ) | |
| THE PRESERVE AT BRIDGEWATER, ) | |
| EDWARD MAMARIL, KATHRYN ) | |
| MAMARIL, RANDY LINDGREN, ROBERT ) | |
| DINN, CHERILYN SHOOK, DAVID BARBER, ) | |
| CHRIS MONROE, MIKE ULLERY, ) | |
|     Defendants. ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

This is an action brought by Plaintiffs, Tonca Watters and Terence Watters, by counsel, against The Homeowners Association at the Preserve at Bridgewater, Edward Mamaril, Kathryn Mamaril, Randy Lindgren, Robert Dinn, Cherilyn Shook, David Barber, Chris Monroe, and Mike Ullery, for their violations of the Fair Housing Act, and 42 U.S.C. § 1982, in violation of Plaintiffs' right to equal and fair housing.

### I.  JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 USC §1331, §1343; and 42 U.S. C. §3613.

2. This action arises under the Fair Housing Act, 42 U.S. C §3617, and 42 U.S.C. § 1982.

3. Venue is proper in the Southern District of Indiana, Indianapolis, Division, as the unlawful housing practices occurred in Howard County, Indiana, within the jurisdiction of the United States District Court for the Southern District of Indiana.

## II.  PARTIES

4.     Plaintiffs Tonca and Terence Watters, are homeowners of two property lots, including a single-family dwelling, located within the Preserve at Bridgewater subdivision, in Kokomo, Indiana.

5.     Defendant, Homeowners Association at the Preserve at Bridgewater is a domestic non-profit corporation doing business in Kokomo, Indiana.

6.     Defendants Edward Mamaril, and Kathryn Mamaril, at all relevant times, were neighbors of the Watters, and at different times served as President of the Homeowners Association at the Preserve at Bridgewater.

7.     Defendants Randy Lindgren. Robert Dinn, Cherilyn Shook, David Barber, Chris Monroe, and Mike Ullery, at all relevant times, served as board members and/or members of the Architectural Committee of the Homeowners Association at the Preserve at Bridgewater.

## III. FACTUAL ALLEGATIONS

8.     Tonca and Terence Watters (collectively "the Watters") are an African-American married couple, who purchased two lots (lots 65 and 66) in the Preserve at Bridgewater subdivision in Kokomo, Indiana ("the Preserve").

9.     The Watters purchased their lots in June 2013.

10.    At the time of their lot purchases, the Watters were the only African-American couple in the subdivision.

11.    In the first few months of the Watters becoming lot owners, they requested a copy of the bylaws and covenant of the Homeowners Association for the Preserve at Bridgewater ("HOA") from the HOA President.

12. The Watters' request for a copy of the by-laws and covenants was denied, and they had to purchase their own copy through the Howard County Recorder's Office.

13. Upon information and belief, when Caucasian homeowners moved into the subdivision, they were provided with a free copy of the covenants upon request.

14. Shortly after their lot purchases, the Watters noticed that pets were being allowed to roam freely on their lots, which was interfering with the construction of their home.

15. The Watters wanted to monitor the progress of the development of their home, and frequently came to view the lots.

16. When the Watters visited the property, they discovered that their lots, and their home, was infested with cat feces, and cats were at large throughout their property.

17. The City of Kokomo Animal Ordinance makes it unlawful for homeowners to allow their pets to be "at large" (not restrained by a leash, or within the immediate and complete control of the pet's owner), or for their pets to be a public nuisance (to damage public or private property).

18. The HOA restrictive covenants also preclude homeowners from allowing their pets to run loose, or to be a nuisance.

19. When the Watters complained to the HOA about the cats, the HOA refused to enforce the restrictive covenants.

20. In the summer of 2014, the Watters noticed that HOA President, Edward Mamaril was allowing his grandchildren to use the Watters' lots as a dirt bike track, and was allowing his guests to use their lot as a parking area.

21. The Watters' also questioned the HOA's lawnmowing schedule, as lawn mowing services were covered by part of the HOA dues.

22. The Watters' lawn was not being mowed regularly, although other lots were being maintained.

23. Before construction began on the Watters' home, they requested to attend the HOA meetings.

24. The Watters were told they could not attend the meetings because they were only lot owners, and not homeowners.

25. The HOA ignored the Watters repeated requests for information regarding the HOA meeting locations, dates, and times.

26. The Watters had to retain an attorney in order to obtain information about the dates, times, and locations of the HOA meetings.

27. When Caucasian families moved into the subdivision, they had no problems attending and securing information about the HOA meetings.

28. HOA officers were also telling other homeowners that the Watters were trouble, and they continued to depict them as bad people to other residents.

29. In June 2015, when the home was being built, the Watters' contractors and homebuilders were insulted and harassed.

30. Ed Mamaril continued to allow his cats to defecate all over the Watters' property.

31. The Watters approached Edward Mamaril and his wife, Kathryn Mamaril and asked that they keep the cats off of their property, and their request was denied.

32. The Watters then contacted the Kokomo Humane Society to report that the cats were at large.

33. As Tonca Watters was speaking with the representative from the Kokomo Humane Society, Kathryn Mamaril, rode by in her car, put up her middle finger, and called Tonca Watters a black bitch.

34. Edward Mamaril approached Ms. Watters in her driveway and told her that "you people" are not wanted in this neighborhood.

35. Mr. Mamaril called the Watters assholes, and said that he had "investigated" them when he heard they were moving into his neighborhood.

36. Mr. Mamaril told Tonca Watters that they needed to move somewhere else.

37. In January 2016, shortly after the Watters moved into their home, they were dealing with a soil accumulation issue on their property.

38. As the Watters were in the process of rectifying the soil problem, the HOA called the City Inspector to report an alleged code violation.

39. When other non-African-American homeowners had landscaping or other exterior violations, the HOA did not contact any City representatives to report violations.

40. In 2016, the Watters requested permission to erect a fence around their property.

41. The HOA denied the Watters' request for a fence and said it was only allowed if they intended to have a swimming pool.

42. The Watters did in fact intend to install a swimming pool, and they informed the HOA of their intentions.

43. The HOA claimed that the Watters could only have a wrought iron fence, which essentially would allow other homeowners to see into their backyard.

44. The Watters wanted to install a wooden fence, and other non-African-American homeowners were approved for wooden fences, that were not uniform and clearly did not comport with the restrictions placed on the Watters.

45. In February 2016, the Watters filed a housing complaint with the Indiana Civil Rights Commission.

46. After the Watters filed their complaint with the ICRC, the HOA Architectural Committee held up the construction of the Watters' swimming pool.

47. HOA members stood in front of the construction trucks and physically precluded them from installing the swimming pool on the Watters' property.

48. In April 2017, after HOA members were spreading untruths about the Watters to various neighbors and vendors, the Kokomo Tribune delivery person started urinating in the Watters' yard.

49. The Kokomo Tribune delivery person was actually caught defecating in the Watters' yard, and had apparently done so, only in their yard, on several occasions.

50. Upon information and belief, the Kokomo Tribune delivery person was urinating and defecating in the Watters' yard at the suggestion and encouragement of HOA members.

51. On or about June 4, 2017, Mr. Watters informed the HOA that he was a disabled veteran, and that he needed a reasonable accommodation in its rules and policies, so that he could erect a fence for the full enjoyment of his home.

52. Mr. Watters needed a privacy fence to engage in therapeutic treatment.

53. Non-African-American homeowners have been allowed to have a fence that offers them privacy.

54. Mr. Watters has numerous medical conditions, including a serious pulmonary impairment, an incurable lung condition, and he suffers from stress and PTSD.

55. Mr. Watters has been declared 100% disabled by both the Veterans Administration and Social Security.

56. HOA members were aware of Mr. Watters' disability.

57. On or about June 17, 2017, the HOA denied Mr. Watters' request for an accommodation and stated that the Fair Housing Act applied "strictly to the rental and sale of most housing," and that the Act did not allow for any application of a reasonable accommodation for an owner-occupied dwelling.

58. The HOA never asked for any follow-up information, never engaged in any interactive dialogue, and simply denied the request based on its belief that the FHA did not apply to it.

59. In late June 2017, the Watters and numerous family members were dining at a local Cracker Barrel restaurant.

60. As the Watters and their family were exiting the restaurant, Kathryn Mamaril and her adult daughter approached the Watters and started making racial comments, and telling them that no one wants them around.

61. The two families got into a heated verbal discussion in the Cracker Barrel parking lot.

62. On or about July 10, 2017, Ed Mamaril and Kathryn Mamaril applied for a protective order against Tonca Watters.

63. The protective order was granted ex parte.

64. The protective order precluded Tonca Watters from directly or indirectly communicating with the Mamaril and it required her to stay away from their residence and place of employment.

65. Edward Mamaril, who was covered by the protective order, held the next HOA meeting at his business office.

66. The protective order effectively meant that Tonca Watters could not participate in the HOA meetings.

67. Terence Watters requested that the meeting be held in a neutral location, given the circumstances, but the HOA refused to relocate or reschedule the meeting.

68. The Mamarils later withdrew the request for a protective order.

69. Upon information and belief, members of the HOA have also been contacting the police department to monitor Plaintiff Terence Watters when he walks around the neighborhood.

70. Upon information and belief, on or about the week of December 11, 2017, an HOA member and/or HOA members contacted the police regarding Plaintiff Terence Watters walking around the subdivision.

71. The Watters have suffered and continue to suffer damages as a result of the discriminatory treatment of the HOA and the Mamarils.

72. The unlawful actions complained of in paragraphs 7-72 were intentional, and were done with reckless disregard of the Watters' right to equal and fair housing.

### COUNT I- VIOLATION OF FAIR HOUSING ACT- INTERFERENCE, RETALIATION, RACE DISCRIMINATION

73. Plaintiffs hereby incorporate by reference and repleads all allegations set forth in paragraphs 1-72.

74. Defendants engaged in discriminatory housing practices when they interfered with the exercise and enjoyment of the Plaintiffs right to fair housing.

75. Plaintiffs had a right to file a complaint with the Indiana Civil Rights Commission and Defendants, and specifically Edward Mamaril and Kathryn Mamaril retaliated against them for filing such complaints.

76. Defendants interfered with the Plaintiffs right to fair housing because of their race.

77. The Defendants' actions resulted in Plaintiffs' damages.

COUNT II- VIOLATION OF FAIR HOUSING ACT BASED ON DISABILITY and RACE

78. Plaintiffs hereby incorporate by reference and re-pleads all allegations set forth in paragraphs 1-77.

79. Terence Watters is a disabled person within the meaning of the Fair Housing Act.

80. The Plaintiffs' home constitutes a "dwelling," as defined by the Fair Housing Act.

81. The Plaintiffs' requested a reasonable modification to the residential property to allow Mr. Watters the full enjoyment and use of his property as a person with a disability.

82. The Homeowners Association refused to make a reasonable modification in a manner that denied Plaintiffs equal rights under the Fair Housing Act.

83. The Homeowners Association refused to make a reasonable accommodation in its rules and policies, that would afford the Plaintiffs an equal opportunity to use and enjoy their property because of Mr. Watters' disability.

84. The Homeowners Association enforced the association rules and policies in an inequitable manner that imposed different terms and conditions of housing on the Plaintiffs because of Mr. Watters' disability.

85. The Homeowners Association enforced the association rules and policies in an inequitable manner that imposed different terms and conditions of housing on the Plaintiffs because of their race.

86. The Defendants' actions resulted in Plaintiffs' damages

## COUNT III- VIOLATION OF 42 U.S.C. §1982

87. Plaintiffs hereby incorporate by reference and re-pleads all allegations set forth in paragraphs 1-86.

88. Defendants violated Section 1982 when they failed to provide the Plaintiffs with the same right to purchase, and hold real property as Caucasian homeowners.

89. Defendants violated Section 1982 when they interfered with the Plaintiffs' property rights.

90. Defendants' actions were motivated by racial prejudice.

91. Defendants' actions resulted in Plaintiffs' damages

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiffs do hereby request the following as relief:

1. Enter judgment in favor of Plaintiffs;

2. Grant a permanent injunction enjoining Defendants, its officers, agents, employees, and all persons in active concert or participation with them, from engaging in any discriminatory housing practice;

3. Grant a permanent injunction enjoining Defendants, its officers, agents, employees, and all persons in active concert or participation with them, from applying and enforcing its restrictions and covenants in a discriminatory manner;

4. Order Defendants jointly and severally liable for compensatory damages, as well as any special damages arising out of Defendants' unlawful conduct;

5.      Award compensation for any and all other damages suffered as a consequence of Defendants' unlawful actions, including but not limited to, inconvenience, emotional distress, humiliation, and embarrassment, in amounts to be determined at trial;

6.      Award punitive damages;

7.      Award all costs and attorney's fees incurred as a result of pursing this action;

8.      Award pre- and post-judgment interest in all sums recoverable; and

9.      Award all other legal and/or equitable relief this Court deems just and proper.

Respectfully submitted,
CURLIN & CLAY LAW,
ASSOCIATION OF ATTORNEYS

*s/Robin C. Clay*
_____
Robin C. Clay, 22734-49
8510 Evergreen Ave. Suite 200
Indianapolis, IN  46240
Telephone (317) 202-0301
Facsimile (317) 282-0688
E-mail: rclay@curlinclaylaw.com

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs respectfully request a jury trial as to all issued deemed triable.

Respectfully submitted,
CURLIN & CLAY LAW,
ASSOCIATION OF ATTORNEYS

*s/Robin C. Clay*
_____
Robin C. Clay, 22734-49
8510 Evergreen Ave. Suite 200
Indianapolis, IN  46240
Telephone (317) 202-0301
Facsimile (317) 282-0688
E-mail: rclay@curlinclaylaw.com