UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

TONCA WATTERS, et al.        )
        )
        Plaintiffs,      )
        )
        v.       )      No. 1:18-cv-00270-MPB-JMS
        )
HOMEOWNERS ASSOCIATION AT THE      )
PRESERVE AT BRIDGEWATER, et al.      )
        )
        Defendants.     )

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Tonca Watters and Terence Watters ("the Watters") have brought this suit against Defendants, members, former members, residents, or developers of the Homeowners Association Board ("the HOA Board") for the Preserves at Bridgewater, a neighborhood in Kokomo, Indiana. (Docket No. 1). Terence and Tonca Watters bring claims under the Fair Housing Act, specifically 42 U.S.C. §3617, for interference, retaliation and race discrimination ("Count I"), and failure to accommodate ("Count II"). (Docket No. 1 at ECF pp. 8–10). They also bring a claim under 42 U.S.C. § 1982 for interfering with the Watters's property rights ("Count III"). (*Id.* at ECF pp. 10–11). All Defendants, the Homeowners Association at the Preserve at Bridgewater ("the HOA"), Edward Mamaril, Kathryn Mamaril, Randy Lindgren, Robert Dinn, Cherilyn Shook, David Barber, Chris Monroe, and Mile Ullery, move for summary judgment as to all claims. (Docket No. 54). This matter is fully briefed. (Docket No. 53; Docket No. 54; Docket No. 57; Docket No. 58). For the reasons that follow, the Court **GRANTS** Defendants' *Motion for Summary Judgment*. (Docket No. 53).

# I.    BACKGROUND

The following material facts are presented in the light most favorable to the Plaintiffs as the non-moving party.[1]

Terence and Tonca Watters reside in the Preserve at Bridgewater ("the Preserve"), a neighborhood in Kokomo, Indiana. (Docket No. 54-1 at ECF p. 8; Docket No. 54-2 at ECF pp. 3–4). They moved into their home in December 2015 and continue to reside there throughout this litigation. (Docket No. 54-2 at ECF p. 11). They are the only African-American family in the subdivision. (Docket No. 54-1 at ECF p. 29).

Defendant Ed Mamaril is a resident in the Preserve. He has been President of the HOA Board since 2015 and has been on the HOA's Architectural Control Committee ("the ACC") since before that time. (Docket No. 54-3 at ECF p. 3). Defendant Kate Mamaril is Edward Mamaril's wife and a former HOA Board President, but has had no role with the HOA Board since 2015. (Docket No. 54-4 at ECF p. 3).

Defendants Mike Ullery and Chris Monroe are not HOA Board members, but are on the ACC. (Docket No. 54-5 at ECF p. 3); (Docket No. 54-5 at ECF p. 5).

The remaining defendants have been or are members of the HOA Board. Defendant

---

[1] Local Rule 56-1(b) sets forth the movants and the non-movant's obligations, respectively, in summary judgment briefing. Subparagraph (b) requires the non-movant to include a response that "must include a section labeled 'Statement of Material Facts in Dispute' that identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment." Local Rule 56-1(b). Moreover, subsection (e) provides "[a] party must support *each* fact the party asserts in a brief with a citation to a discovery response, a deposition, an affidavit, or other admissible evidence. . . . The citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." Local Rule 56-1(e) (emphasis added). Terence and Tonca Watters have not complied with these Local Rules, instead generically providing a "Statement of Facts." "The court has no duty to search or consider *any* part of the record not specifically cited in the manner described in subdivision (e)." S.D. Ind. Local Rule 56-1(h).

Randy Lindgren is the HOA Board Vice-President. (Docket No. 54-3 at ECF p. 16). Robert Dinn has been an HOA Board Secretary, but is no longer on the Board. (Docket No. 54-6 at ECF p. 3). Cherilyn Shook is the HOA Board Treasurer. (Docket No. 54-3 at ECF p. 16). Defendant David Barber is the HOA Board member at large. (*Id.*). In their own testimony, Terence and Tonca Watters state they have no claims or evidence to support any claims against Randy Lindgren, Robert Dinn, Cherilyn Shook, David Barber, or Chris Monroe, in their individual capacities. (Docket No. 54-1 at ECF p. 22–23; Docket No. 54-2 at ECF p. 12).

The Watters raise a broad range of allegations in this suit, which can be arranged by category.

**A. The Watters's Requests for Copies of Covenants and other HOA Documents**

Terence and Tonca Watters requested a copy of the Dedication and Restrictive Covenants and Homeowners Association for the Preserve at Bridgewater ("the Covenants"), but Kate Mamaril, then HOA Board President, refused to give them a copy. (Docket No. 54-2 at ECF p. 18). Thereafter, on October 28, 2013, Terence Watters, by counsel, requested a copy of the current by-laws of the HOA, a copy of the by-laws in place as of April 1, 2013, and a copy of the transcript and/or minutes of the last meeting of the HOA from Ed Mamaril. (Docket No. 57-1). Neither Ed Mamaril nor any member of the HOA Board complied with the request. Terence and Tonca Watters ultimately obtained a copy of the covenants by purchasing a copy from the Recorder's office. (Docket No. 1 at ECF p. 3).

Terence and Tonca Watters believe that they were discriminated against by Ed Mamaril and the HOA's failure to answer their requests. The HOA Board does not give new residents copies of the covenants; instead, new buyers are to obtain copies from their realtors or the people from whom they are buying the house. (Docket No. 54-4 at ECF p. 3). Another neighbor

told Terence Watters that another unknown individual, perhaps a board member (maybe Kate) or just someone else from the community, had given that neighbor a free copy of the covenants. (Docket No. 54-1 at ECF p. 8). Like Terence and Tonca Watters, the Mamarils also had to obtain a copy of the covenants when they moved in by purchasing a copy from the Recorder's office. (Docket No. 54-4 at ECF p. 3).

Terence and Tonca Watters requested and were denied agendas for HOA meetings. Terence Watters does not know the date of the meeting for which he requested an agenda that was not provided. (Docket No. 54-1 at ECF p. 13). On at least one occasion, Terence Watters was provided an HOA agenda when he requested one. (Docket No. 54-1 at ECF pp. 13, 61). Terence and Tonca Watters did not attend one HOA meeting while there was an order of civil protection in place against Tonca Watters and in favor of Kate Mamaril. Tonca could not say whether she would have attended the HOA meeting if the protective order had not been in place and she has not attended any meetings after the protective order was no longer in place. (Docket No. 54-2 at ECF p. 13). None of the Defendants have told Terence and Tonca Watters that they cannot attend an HOA meeting. (Docket No. 54-2 at ECF p. 9).

## B. Pets at the Preserve

The Covenants state that "[n]o pets shall be permitted to run loose." (Docket No. 54-1 at ECF p. 40). Terence and Tonca Watters have had issues with the Mamarils allowing their cats to roam free and enter the Watters's yard and cause damage to the Watters's property. (Docket No. 54-1 at ECF p. 6). During the Watters's home construction, the construction crew was regularly spending 20-30 minutes per day trying to get rid of the cats. (Docket No. 54-2 at ECF p. 3). When the Mamarils initially moved into the Preserves, prior to the Watters's arrival, they allowed their cats to go free in the neighborhood without complaint. (Docket No. 54-3 at ECF

pp. 17–18). Kate Mamaril also feeds the stray or feral cats that roam the neighborhood and has done so prior to Terence and Tonca Watters moving into the neighborhood (Docket No. 54-2 at ECF p. 4). Mike Ullery and his wife allow their dog to urinate and defecate on the Watters's property. (Docket No. 54-2 at ECF p. 3).

Terence and Tonca Watters have repeatedly requested that the covenants be enforced. (Docket No. 54-2). Terence and Tonca Watters believe that the covenants regarding pets have not been enforced because of their race. (Docket No. 54-1 at ECF p. 6). The HOA Board has not taken actions to actively enforce the covenants regarding pets because it "determined that [ ] we have no way to reinforce that, other than for the City of Kokomo to intervene. The ordinance of the City of Kokomo supercedes [sic] that one sentence in the restrictive covenants." (Docket No. 54-3 at ECF p. 6; Docket No. 54-6 at ECF p. 5). Terence and Tonca Watters had no evidence that the HOA Board has ever taken an action to enforce the covenant. (Docket No. 54-1 at ECF p. 5–6, 18).

The Ullery's dog has urinated or defecated on other properties in the neighborhood (Docket No. 54-2 at ECF p. 3) and Mike Ullery has also walked his dog on other people's property in the neighborhood. (Docket No. 54-2 at ECF p. 10). Robert Dinn (Caucasian) has also had problems with dogs and cats urinating and defecating in his yard, eating his plants, getting on his pool cover, and getting on his furniture. (Docket No. 54-6 at ECF p. 4).

Terence and Tonca Watters have called the Humane Society to complain about pets in the neighborhood not being restrained and these complaints have resulted in fines to others in the neighborhood, including the Mamarils. (Docket No. 54-1 at ECF p. 17; Docket No. 54-3 at ECF p. 5).

## C. Terence and Tonca Watters Request a Fence

The Covenants, which were executed in 2004, provide the following with respect to fences:

> 6. . . . No fence or wall shall be erected, placed or altered on any lot unless approved in writing by the Architectural Control Committee and the appropriate local government entity. . .
>
> . . .
>
> 10. Pools, Fences and Miscellaneous Structures
>
> . . .
>
> II. Fences. No fences, except those for pool safety and decorative landscaping purposes approved by the Architectural Control Committee, are allowed.
>
> . . .
>
> 34. Each owner of a lot within The Preserve at Bridgewater shall be responsible for the construction of any fence of brick, stone or wood, that said owner desires to erect on said lot and shall do so only with written approval by the Architectural Control Committee.

(Docket No. 54-1 at ECF pp. 37–47).

On May 4, 2016, Terence and Tonca Watters requested permission from the ACC to install a six-foot tall, vinyl privacy fence that was to enclose the Watters's pool and a portion of their yard. (Docket No. 54-1 at ECF pp. 8–10).[2] On May 20, 2016, the ACC advised Terence and Tonca Watters, via e-mail, that their request had been denied. (Docket No. 54-1 at ECF p. 11; Docket No. 57-9 at ECF p. 3). The ACC advised Terence and Tonca Watters that their "request cannot be acted upon until more information is made known to the committee." (Docket No. 57-9 at ECF p. 3). The ACC further advised Terence and Tonca Watters (specifically, Terence) to:

> Please direct your attention to the Dedication and Restrictive Covenants for the Preserve at Bridgewater, Paragraph No. 10, sub-paragraph "B," titled "Fences", which reads: "No fences, except those for pool safety and decorative landscaping purposes approved by the Architectural Control Committee, are allowed."

---

[2] Neither side provided the Court with the full email that Terence Watters sent to Mike Ullery. (Docket No. 57-9 at ECF p. 3, providing only a portion of the e-mail).

The only style fencing that would be considered for approval would generically be described as "black wrought iron fencing", although the fence material can be made from materials other than iron. Fences of this type are considered "safety" or "security" fences, not privacy fences, and are acceptable because they allow for a minimum of sight line interruption from lot to lot. Landscape vegetation, however, may be planted on or around fencing to further enhance privacy. Under no circumstances would the Architectural Control Committee approve "privacy style" fencing such as you have presented.

If you wish to submit another request for the construction of a fence which conforms to the above restrictions, please include with your request the reason for the fence, the style, height and material of the fence and a detailed site plan showing the exact location of the fence with regard to existing structures.

(Docket No. 57-9 at ECF p. 3).

On February 21, 2017, Terence and Tonca Watters were again told by the ACC that "fencing which does not interrupt 'line of sight' is the only type the committee will approve. In other words, privacy fences will not be approved." (Docket No. 54-1 at ECF p. 51).

Terence Watters did not raise his disability when he initially requested a privacy fence in 2016. (Docket No. 54-1 at ECF p. 12). He informally advised the ACC about his disability of idiopathic pulmonary fibrosis. (Docket No. 54-1 at ECF p. 11).[3] Sometime around 2014, Mike

---

[3] Terence Watters's exact testimony regarding his informal discussion with the ACC was:

Q: How did you explain [to the ACC that your disability was one of the reasons you were requesting a privacy fence]?

A: I said I would be using my pool in the area for therapeutic reasons, and I would like—if I use for privacy for security or safety or—I don't know what the language is, but it was explained to them. I don't know the exact words, but it was explained to them. I didn't feel that I needed to go and put my condition out there because under the covenant, it didn't say that I had a particular type or size of fence. That's why I put in for the type and size that I had requested for.

(Docket No. 54-1 at ECF p. 12).

Ullery became aware that Terence Watters had a non-curable respiratory disease. (Docket No. 54-5 at ECF p. 9). Mike Ullery shared this information with the HOA Board and Chris Monroe. (*Id.*). On June 4, 2017, Terence Watters sent another request to Ed Mamaril as the HOA Board President, which he states was a "formal Request [for a privacy fence] for Reasonable Accommodation under the Fair Housing Act." (Docket No. 57-8 at ECF p. 1). The letter further stated: "This accommodation is reasonable and necessary in order for me to enjoy the full use of my property." (*Id.*). The letter advised that Terence is "100% Disabled according to Social Security Administration, Medicare and the Department of Veterans Affairs with as [sic] defined under the Fair Housing Act." (*Id.*).

On June 17, 2017, the HOA Board denied Terence's request finding the Fair Housing Act inapplicable and explained that the Preserve's absence of privacy fences contributes to the subdivision's unique harmony in design. (Docket No. 57-9 at ECF p. 2). The HOA indicated that it is considerate of its members' privacy and recommends the use of landscape vegetation for that purpose. (*Id.*). Terence and Tonca Watters did not submit a request for an alternative style fence. (Docket No. 54-1 at ECF p. 12). Terence Watters did not provide the HOA with more detail regarding his disability after his June 4, 2017, letter because they never asked. (Docket No. 54-1 at ECF p. 36).

In addition to his lung issues, Terence Watters has PTSD. (Docket No. 54-1 at ECF p. 26). While on assignment in the military, Terence Watters had a traumatic experience with a dog, which causes him to be stressed around dogs to this day. (*Id.*). Because of his lung issues and his PTSD, Terence Watters has difficult breathing, performing manual tasks, concentrating, and he is unable to work. (Docket No. 57-6 at ECF p. 2). Terence Watters's therapist told him that a privacy fence would be "beneficial." (Docket No. 54-1 at ECF p. 26). None of this information

was provided to the HOA Board or the ACC when the privacy fence was requested. (Docket No. 54-1 at ECF p. 27).

Terence and Tonca Watters believe that their request for a privacy fence was denied because of their race. (Docket No. 54-1 at ECF p. 8). The ACC has denied requests for fences that would block the line of sign, including privacy fences. (Docket No. 54-3 at ECF p. 8; Docket No. 54-5 at ECF p. 8). As Ullery testified: "We decided we did not want to have a neighborhood that each lot was interrupted by a fence all the way around their yard, no privacy fence all the way around the yard." (Docket No. 54-5 at ECF p. 9).

The ACC has denied requests or inquiries from other homeowners in the neighborhood, besides Terence and Tonca Watters, for privacy fences. (Docket No. 54-3 at ECF pp. 8, 18; Docket No. 54-6 at ECF pp. 3–4). Robert and Jaime Dinn built their home in 2006 to 2007. (Docket No. 54-6 at ECF p. 3). They made an informal request for a privacy fence with Mike Ullery, who built their home and is on the ACC, but Mike advised that they could not have a privacy fence. (Docket No. 54-6 at ECF pp. 3–4). Thereafter, when the Dinn's built their pool and safety railing they applied for approval of the same from the ACC and received the committee's approval in August 2014. (Docket No. 54-1 at ECF p. 54). Robert Dinn is Caucasian. (Docket No. 54-6 at ECF p. 3). Jeremy Shearer inquired about a privacy fence sometime after 2015. (Docket No. 54-1 at ECF p. 55). His request was denied, and he subsequently put in an electronic fence to confine his dog. (*Id.*). Jeremy Shearer is Caucasian. (Docket No. 54-5 at ECF pp. 13–14). Thomas Yeary made a similar request to Jeremy Shearer's request sometime after 2017 and was also denied. (Docket No. 54-1 at ECF p. 57). Thomas Yeary is Caucasian. (Docket No. 54-1 at ECF p. 20).

There has only been one home[4] in the neighborhood with a "privacy fence." (Docket No. 54 at ECF p. 7). Rick and Charlene Smith built their house in 2007, which was possibly[5] prior to the HOA and ACC's existence, and they petitioned the builders to allow a small, six-foot-tall cedar fence to be installed that did not block any neighbor's line of sight in order to contain the dogs. (Docket No. 54-1 at ECF p. 56). The plan was accepted. *Id.*

**D.     Terence and Tonca Watters Install a Swimming Pool**

Like the fence, a homeowner must receive ACC approval for the installation of a pool. Terence and Tonca Watters believe that they were discriminated against because some of the Defendants delayed their pool construction. (Docket No. 54-1 at ECF p. 18). Ed Mamaril indicated the ACC received the application for the swimming pool the night before the pool was to be installed. (Docket No. 54-3 at ECF p. 13). The morning that the construction company arrived at the Watters's residence to install the pool Ed Mamaril and Mike Ullery stopped the construction from beginning and decided to review the plans on the spot. (Docket No. 54-3 at ECF p. 13; Docket No. 54-5 at ECF p. 10). The plans were approved, and construction was allowed to proceed. (Docket No. 54-2 at ECF p. 9; Docket No. 54-3 at ECF p. 13). Construction

---

[4] Tonca Watters testified at her deposition that a second house in the neighborhood has a privacy fence. (Docket No. 54-2 at ECF p. 17). However, this testimony is demonstrably false, as shown by the affidavit and pictures submitted by the homeowner establishing that he has only a short, decorative and removable garden fence enclosing a small portion of his land. (Docket No. 54-8). The affidavit and pictures were provided in conjunction with the Defendants' opening brief and the accuracy of those pictures was not disputed by Terence and Tonca Watters in subsequent briefing.

[5] Defendants' own parties/witnesses disagree on when the ACC was formed. Mike Ullery testified that the ACC was set-up at the same time of the original covenants (Docket No. 54-5 at ECF p. 4). The letter from Rick & Charlene indicated that they petitioned the builders because there was no HOA at the time. (Docket No. 54-1 at ECF p. 56). The 2004 Covenants indicate that the HOA (Docket No. 54-1 at ECF p. 43) and the ACC (Docket No. 54-1 at ECF p. 42) were created simultaneously with the execution of the Covenants. Regardless, as the analysis will show, this disputed fact is not genuine.

started the same day after a delay of only hours. (Docket No. 54-1 at ECF p. 18; Docket No. 54-5 at ECF pp. 10–11).

### E.  Other House/Neighborhood Issues

Terence and Tonca Watters requested to have their mailbox placed on the same side of the street as their home. (Docket No. 54-1 at ECF p. 29). Ed Mamaril told Terence and Tonca Watters that they could not put a mailbox on the same side of the street as the Watters's home and that, if they did, a lawsuit would be filed against them. (*Id.*). Two other Caucasian families were allowed to have their mailboxes on the same as their homes, but these were eventually moved by the postal service after six months to a year. (Docket No. 54-1 at ECF pp. 29–30).

Terence and Tonca Watters were also told[6] that they had to have the posts on their porch sit a certain way, but other Caucasian homeowners[7] have been allowed to have their posts in all different ways. (Docket No. 54-1 at ECF p. 29). Terence and Tonca Watters were limited in the type of color they could choose for their home and they could not have a color that was the same color as a house within close proximity. (*Id.*). But the Caucasian families were allowed to have the color of their choice and when their houses are close, they can be of the same color. (*Id.*).

The police have been called on Terence Watters twice while he was walking around the neighborhood. (Docket No. 54-1 at ECF p. 18). He has "nod idea" who called the police and

---

[6] It is unclear who told Terence and Tonca Watters they had these restrictions. (Docket No. 54-1). This information was given in answer to a question: "Tell me what specifically—why do you believe that you're being discriminated against by the homeowners association based on your race?" (Docket No. 54-1 at ECF p. 29). Thus, it is not clear if Terence is indicating that he was told these things by the HOA Board, by the ACC, or by any of the individual Defendants. There is also no allegation that Terence and Tonca Watters made a formal ACC request for these items and that request was denied.

[7] The Caucasian homeowners were not specifically identified in the cited to evidence. (Docket No. 57). Again, the Court has no duty to search the record.

does not know if it was one of the Defendants. (*Id.*).

**F. Terence and Tonca Watters and the Mamarils**

Since the Watters's 2015 arrival at the Preserve, they and the Mamarils have had numerous run-ins. During the Watters's home's construction, Terence and Tonca Watters, by counsel, had sent a letter to the Mamarils requesting a copy of the Preserve's restrictive covenants. (Docket No. 54-1 at ECF pp. 6–7). Sometime thereafter, but before Terence and Tonca Watters moved into their home, Ed Mamaril asked Terence Waters, "Why did you people move here? You could have moved somewhere else." (Docket No. 54-1 at ECF p. 6). Ed Mamaril also called Terence and Tonca Watters (unspecified) names and told Terence and Tonca Watters he had investigated them. (Docket No. 54-2 at ECF p. 11).

In March 2016, after Tonca had called the Humane Society on Kate Mamaril because her cats had been on the Watters's property, According to Tonca Watters, Kate Mamaril called her, "black bitches, black niggers, and wanted to know why the F I moved out there, and I was trouble and making her life miserable." (Docket No. 54-2 at ECF p. 14). Terence and Tonca Watters have called the Humane Society to complain about pets in the neighborhood not being restrained and these complaints have resulted in fines to others in the neighborhood, including the Mamarils. (Docket No. 54-1 at ECF p. 17; Docket No. 54-3 at ECF p. 5).

In June 2017, Terence and Tonca Watters and the Mamarils, both couples with other family members, engaged in a dispute at a Cracker Barrel restaurant near their home. Either Kate Mamaril or her daughter made a derogatory remark regarding Tonca Watters and her grandchildren. (Docket No. 54-2 at ECF p. 15)[8]. Terence and Tonca Watters left the restaurant

---

[8] From her testimony it is difficult to discern to whom Tonca Watters's attributes the statement. (Docket No. 54-2 at ECF p. 15) (". . . And I looked and it was Kate and her daughter sitting at the table. And she said, 'Look at her with nigger monkeys, little monkey niggers.' Something to

first, but were still in the parking lot when the Mamarils exited and pushed through the Watters's group. (Docket No. 54-1 at ECF p. 23). This occurrence resulted in the above-discussed protective order.

## II. STANDARD OF REVIEW

Summary judgement is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court must view the evidence, and draw all reasonable inferences therefrom, in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *Landgrebe Motor Transp., Inc. v. District 72, Int'l Assoc. of Machinists*, 763 F.2d 241, 244 (7th Cir. 1985). The party that bears the burden of proof on a particular issue cannot rest its case on the pleadings, but must demonstrate by specific factual allegations that there is a genuine issue of material fact that requires a trial. *Celotex*, 477 U.S. at 324. The plaintiff gets the benefit of the doubt "only if the record contains competent evidence on both sides of a factual question." *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 367 (7th Cir. 1997). If the plaintiff's evidence is "merely colorable" or "not significantly probative," then there is no genuine issue for trial and summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

## III. DISCUSSION

Defendants request summary judgment on each of the Watters's three claims. With respect to Randy Lindgren, Robert Dinn, Cherilyn Shook, David Barber, and Chris Monroe, in their individual capacities, Plaintiffs have offered no affirmative evidence in attempt to defeat

---

that effect concerning my grandchildren running through the restaurant being children.").

summary judgment and so their dismissal at summary judgment is a "foregone conclusion." (Docket No. 54-1 at ECF pp. 22–23; Docket No. 54-2 at ECF p. 12). *See Walton v. Claybridge Homeowners Assoc., Inc.*, 191 Fed. Appx. 446, 450 (7th Cir. 2006) (noting individual-capacity-named defendants' dismissals at summary judgment was a foregone conclusion where plaintiff offered no evidence concerning the defendants). Summary judgment is therefore appropriate on this basis alone. Even if it were not, the remaining discussion applies to these Defendants as well.

The Court will first turn to the Watters's claims under the Fair Housing Act (Counts I and II). The Watters's FHA claims, as set forth in their complaint, overlap and do not align with the parties' summary judgment briefing. Count I addresses violations of the FHA due to interference, retaliation, and race discrimination, but Count II also addresses violations of the FHA due to race discrimination and disability. None of the Counts specify as to which Defendants they are brought against. For the purposes of this analysis, the Court will first consider the Watters's general race discriminations allegations under the FHA and then will address the Watters's more specific race and disability discriminations as to the ACC's denial of their privacy fence, before turning to Plaintiffs' 42 U.S.C. § 1982 claim.

## A. 42 U.S.C. § 3617 as Related to Racial Discrimination

Defendants argue that summary judgment is appropriate as to the Watters's first two claims brought under 42 U.S.C. § 3617, the Fair Housing Act, because Terence and Tonca Watters cannot meet the *prima facie* elements of the FHA. The Seventh Circuit has recognized that the protections afforded by the Fair Housing Act continue after the person takes possession of his home, condominium, or apartment. *Bloch v. Frischholz*, 587 F.3d 771, 782 (7th Cir. 2009) (*en banc*). Section 3617 makes it unlawful:

to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encourage any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

42 U.S.C. § 3617. Of relevance section 3604 protects against discrimination in the sale or rental of housing. Sections 3604(a) and (b) have been interpreted as prohibiting discriminatory evictions, and "attempted discriminatory evictions can violate § 3617's prohibition against interference with § 3604 rights." *Bloch*, 587 F.3d at 782. In other words the lack of a constructive eviction does not foreclose the possibility that the defendants "interfered" with the plaintiffs' enjoyment of their § 3604 rights or "coerced" or "intimidated" the plaintiffs on account of their having exercised those rights. *Id.*[9] The Seventh Circuit has explained that this interpretation of § 3617 is aligned with HUD regulation, 24 C.F.R. § 100.400(c)(2), which prohibits "[t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color . . . [or] handicap . . . of such persons." *Bloch*, 587 F.3d at 781.

So the § 3617 question in this case is whether the Defendants coerced, intimidated, threatened, or interfered with the Watters's exercise or enjoyment of their right to inhabit their home because of their race or Terence Watters's handicap (as analyzed in the next section). As the Seventh Circuit has explained:

> To prevail on a § 3617 claim, a plaintiff must show that (1) she is a protected individual under the FHA, (2) she was engaged in the exercise or enjoyment of her fair housing rights, (3) the defendants

---

[9] Defendants assert that to support a claim under § 3617 for a violation of § 3604 a plaintiff must provide evidence of acts analogous to a constructive eviction. (Docket No. 54 at ECF p. 16, *citing Lewis v. Schmidt*, No. 10 CV 1819, 2011 WL 43029 (N.D. Ill. Jan 4, 2011). However, *Lewis* did not bring a claim under § 3617 citing a violation of § 3604, but instead brought a claim under § 3604 directly. As discussed in *Bloch*, it is clear that the Seventh Circuit has set forth different standards for a claim brought under § 3604 directly or under § 3617. *See Bloch*, 587 F.3d at 781–82 ("to hold otherwise would make § 3617 entirely duplicative of the other FHA provisions; though its language is unique in the FHA[.]").

coerced, threatened, intimidated, or interfered with the plaintiff on account of her protected activity under the FHA, and (4) the defendants were motivated by an intent to discriminate. "Interference" is more than a "quarrel among neighbors" or an "isolated act of discrimination," but rather is a "pattern of harassment, invidiously motivated."

*Bloch*, 587 F.3d at 782–83 (citations omitted).

Terence and Tonca Watters clearly meet the first two elements: they are African American and, in Terence Watters's case, have a disability, and they own a house they purchased at the Preserve at Bridgewater. As to race, which is this section's focus, a showing of intentional discrimination is essential. *East-Miller v. Lake County Highway Dep't*, 421 F.3d 558, 563 (7th Cir. 2005). This intent may be shown either directly or indirectly under the burden shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See East-Miller*, 421 F.3d at 563. The conduct Terence and Tonca Watters allege occurred must also rise to the level of coercion, intimidation, or interference that § 3617 was designed to address. *See id.*

The Seventh Circuit has emphasized that a party wishing to avoid summary judgment must present *some* evidence from which a jury could rationally infer that the events complained of are motivated by intentional discrimination. *East-Miller*, 421 F.3d at 564. Here there is no direct evidence of discriminatory intent. *See, e.g., Kormoczy v. Secretary, U.S. Dept. of Housing and Urban Development on Behalf of Briggs*, 53 F.3d 821, 824 (7th Cir. 1995) ("Direct evidence is that which can be interpreted as an acknowledgment of the defendant's discriminatory intent."). Terence and Tonca Watters argue that, with regards to Kate and Ed Mamaril, the racial slurs and references to "you people" are direct evidence of intentional discrimination. (Docket No. 57 at ECF p. 12). Racial slurs can create an inference of race discrimination. *See East-Miller*, 421 F.3d at 563. But, there is a difference between a pattern of

and an isolated act of harassment. *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004). In *Halprin*, the Seventh Circuit held the plaintiff's complaint was sufficient to survive a motion to dismiss because the allegations that the homeowners' association waged a campaign of harassment against the plaintiff on account of his religion presented the type of pattern that could violate § 3617. In another case, however, the Seventh Circuit held that a homeowner could not prevail at trial based on racial slurs by a homeowner who was also on the homeowner association board. *See Walton*, 191 Fed. Appx. at 452. Moreover, "you people," as used by Ed Mamaril, by itself is not necessarily a racial slur. *See Bush v. J&J Transmission, Inc.*, No. 11-cv-289, 2014 WL 123439, at *3 (N.D. Ill. Jan. 14, 2014) ("While it is undeniable that the phrase 'you people' [and similar phrases] can be used in a derogatory manner, here, there is no evidence that this was [Defendant's] intent and [Plaintiff] fails to proffer any arguments or evidence [otherwise].") (internal quotations omitted). The Seventh Circuit also noted that the individual's "board membership" was not enough for the stray remark to have "'some nexus' to the challenged action." *See id.* (citing *Scaife v. Cook County*, 446 F.3d 735, 741 (7th Cir. 2006)). *See also Sheikh v. Rabin*, 565 Fed. Appx. 512, 518 (7th Cir. 2014) ("But taken together, these allegations would establish only that different neighbors at different times made shameful statements, not that any individual neighbor (or the neighbors as a group) interfered with Sheik's rights under [the FHA].").[10] The remarks by the Mamarils, taken at this stage as having occurred, while troubling, are simply too attenuated

---

[10] Terence and Tonca Watters cite to *Mehta v. Bolingbrook*, 196 F. Supp. 3d 855, 867 (N.D. Ill. 2016) for the proposition that there is no authority that a nexus is required between the racial comments and the challenged actions. Unlike *Mehta*, where the defendants cited no authority for their argument, here the defendants have cited *Walton*, which is factually analogous with this case, and several other in-circuit cases to support their argument. (Docket No. 54 at ECF pp. 17–18). Terence and Tonca Watters did not address the *Walton* case's use of the "nexus" application.

from any of the challenged actions. *See Walton*, 191 Fed. Appx. at 452 ("[The Seventh Circuit] recognized that an isolated racial or religious slur made in the context of a neighborhood quarrel does not a federal discrimination case create.").

Additionally, no evidence was offered to show intentional discrimination due to the other alleged "interferences," such as calling the police on Terence Watters as he walks through the neighborhood, delaying the installation of the pool, denying the installation of the privacy fence, the Cracker Barrel incident and the subsequent protective order, the pet incidents, investigating Terence and Tonca Watters before they moved in, and the mailbox incidents. (Docket No. 57 at ECF pp. 13–14). An examination of this evidence, individually and as a whole, shows that the evidence is insufficient to create a triable issue, as it fails to demonstrate that any improper action that negatively affected the Watters's fair housing rights was motivated by race.

Terence and Tonca Watters have no evidence that the Board or any of the individual Defendants called the police on Terence and Tonca Watters. This allegation provides no support for the Watters's claims. *See Walton*, 191 F. App'x at 451 ("[Plaintiff] cannot even say who was responsible for the 'numerous occasions' that police were called to her house, or for leaving trash in her yard and mailbox"). The delay in the installation of the Watters's pool, which lasted no more than a few hours at most, was *de minimis* and justified. The evidence shows Terence and Tonca Watters submitted their pool plans shortly before the pool's installation date. The committee approved the plans on the spot in order to not further delay the pool installation.

The Cracker Barrel incident does not support the Watters's FHA discrimination claim. This incident did not occur in the neighborhood, was not a Board or HOA function, and did not involve other residents of the neighborhood. Tonca Watters's testimony makes clear that Ed

Mamaril attempted to de-escalate the situation by telling his adult daughter to "leave [Terence and Tonca Watters] alone and get in her car." (Docket No. 54-2 at ECF p. 12). The Cracker Barrel incident appears to have been a personal incident involving the Mamaril and Watters families. Public disputes or altercations between people who live in the same neighborhood do not form the basis of a federal claim for the denial of fair housing rights. The Cracker Barrel incident and the protective order that followed simply show that Terence and Tonca Watters and the Mamarils have a tumultuous relationship and clearly do not get along.

It is arguable that the residents of the Preserves generally do not follow the letter of the City ordinances or restrictive covenants regarding pet ownership. Yet, no authority exists to support the proposition that the failure to take some unidentified action to enforce covenants equates to a federal civil rights violation. Moreover, Terence and Tonca Watters are not being treated differently than other homeowners with respect to pets—it is undisputed that pets roam free on other homeowners' properties in addition to the Watters's property. The Mamarils allowed their cats to roam free before Terence and Tonca Watters moved to the neighborhood— thus, it cannot be concluded that the Mamarils direct their cats onto the Watters's property because of the Watters's race as the Mamarils allowed their cats to roam free prior to Terence and Tonca Watters living in the neighborhood. The evidence shows that the HOA Board simply does not enforce pet restrictions—thus, the Watters's claims regarding racial discrimination in the context of pet violations fails. *See Bloch*, 587 F.3d at 785 (recognizing that neutral enforcement of a rule does not equate to intentional discrimination).

Terence and Tonca Watters have not shown or articulated how Ed Mamaril's investigation had any affect on their housing rights. Terence and Tonca Watters moved into their residence after being informed of this investigation and have not argued that any

investigation either made the process more difficult or has otherwise affected their ability to use their home. Absent such a causal connection, any investigation is irrelevant and does not constitute a violation of the FHA or of any constitutional right.  Similarly, it is undisputed that other homeowners who put their mailbox on the wrong side of the street were notified of this fact by the HOA Board and were ultimately required to move their mailbox by the Post Office. (Docket No. 54-3 at ECF p. 9; Docket No. 54-5 at ECF p. 6). In sum, nothing in the record establishes direct evidence of discrimination by any defendant.

However, the direct method is not the only way to prove intentional discrimination under the Fair Housing Act; a party can use the indirect, burden-shifting method articulated in *McDonnell Douglas Corp.*, 411 U.S. at 802–03. *See also East-Miller*, 421 F.3d at 563 (citing *Kormoczy,* 53 F.3d at 823–824). Terence and Tonca Watters invoke that method here by offering evidence that the ACC denied their request for a fence, but that other Caucasian families that were similarly situated were permitted to have a fence. To create an inference of discrimination under *McDonnell Douglas*, Terence and Tonca Watters had to show that her Caucasian neighbors were similarly situated and treated more favorable. *See Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005) (articulating similarly situated requirement in Title VII context). This they have not done. Terence and Tonca Watters assert that the Smiths (Caucasian) were similarly situated and had a privacy fence. (Docket No. 57 at ECF p. 14). Even drawing the inference, as the Court must, that the HOA and the ACC existed at the time of the Smith's request, the Smiths are not similarly situated because they requested a small, six-foot-tall-cedar fence to be installed that did not block any neighbor's line of sight. (Docket No. 54-1 at ECF p. 56; Docket No. 54-5 at ECF p. 14). *See Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000), *overruled on other grounds by Ortiz v. Werner Enterprises,*

*Inc.*, 834 F.3d 760 (7th Cir. 2016) (providing that "similarly situated" means that individuals "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct"). Terence and Tonca Watters also assert that the Stedrys (Caucasian) were similarly situated and were allowed to install a white garden fence without seeking permission from the Architectural Committee. (Docket No. 57 at ECF p. 14). Again, the Stedrys are not similarly situated to Terence and Tonca Watters as their home has a three-foot-picket fence that encloses a small garden, not a six-foot vinyl privacy fence that would enclose a pool and a portion of the Watters's yard. (Docket No. 54-8 at ECF pp. 1, 7). The fence does not block the line of sight and is a decorative fence specifically allowed by the covenants. (Docket No. 54-1 at ECF p. 39; Docket No. 54-5 at ECF p. 7). Thus, whether the Stedry/Smith fences were properly approved by the ACC is irrelevant. These fences are not similarly situated given the differentiating circumstance, i.e., that the Watters's fence would block the line of sight. *See Goodwin v. Bd. of Trs. of Univ. of Ill.*, 442 F.3d 611, 618 (7th Cir. 2006) (refusing to infer intentional discrimination from treatment of employees who were not similarly situated to plaintiff).

The ACC has denied multiple requests by Caucasian homeowners for privacy fences. *See supra*, Section I. C. This includes Robert and Jaime Dinn, Caucasians, who made an informal request for a privacy fence to ACC member Mike Ullery, who advised them they could not have a fence (Docket No. 54-6 at ECF pp. 3–4); Jeremy Shearer, Caucasian, was denied a privacy fence around 2015 (Docket No. 54-1 at ECF p. 55); and Thomas Yeary, Caucasian, was denied a privacy fence sometime after 2017 (Docket No. 54-1 at ECF p. 57). This evidence aligns with Ullery's testimony: "We decided we did not want to have a neighborhood that each lot was interrupted by a fence all the way around their yard, no privacy fence all the way around the

yard." (Docket No. 54-5 at ECF p. 9). Additionally, the Watters's post and color issues have not set forth sufficient evidence to determine if the unnamed Caucasian neighbors were similarly situated. *See Celotex*, 477 U.S. at 324 (requiring party carrying the burden of proof to provide specific factual allegations as to genuine issues of material fact).

As the Seventh Circuit has previously stated, the FHA was not drafted to permit quarrels between neighbors to become a routine basis for federal litigation. *Halprin*, 388 F.3d at 330. The evidence falls short of the convincing mosaic required to show intentional discrimination. *See generally East-Miller*, 421 F.3d at 564 (affirming summary judgment for defendants on § 3617 claim and noting that the incidents at issue may have inconvenienced the plaintiff but did not present a triable issue of intentional discrimination). The Defendants are entitled to summary judgment on the Watters's 42 U.S.C. § 3617 claims based on racial discrimination.

## B.  42 U.S.C. § 3617 as Related to Disability and Reasonable Accommodation

The Fair Housing Act, as amended ("FHAA"), makes it unlawful to discriminate against a person with a handicap by refusing "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). "The basic elements of an FHAA accommodation claim are well-settled." *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 752 n. 12 (7th Cir. 2006) (*en banc*). "The FHAA requires accommodation if such accommodation (1) is reasonable, and (2) necessary, (3) to afford a handicapped person the equal opportunity to use and enjoy a dwelling." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 783 (7th Cir. 2002).

An accommodation is "reasonable" when it imposes no "fundamental alteration in the nature of the program" or "undue financial and administrative burdens." *Southeastern*

*Community College v. Davis*, 442 U.S. 397, 410 (1979). "Equal opportunity" under the FHAA is defined as "giving handicapped individuals the right to choose to live in single-family neighborhoods, for that right serves to end the exclusion of handicapped individuals from the American mainstream." *Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 794–95 (6th Cir. 1996). Equal opportunity is tied to whether an accommodation is "necessary." To show that the privacy fence is necessary, Terence and Tonca Watters must show that Terence Watters will be denied equal opportunity to live in the residential neighborhood without the requested privacy fence, as opposed to a wrought-iron fence with landscaping or some other type of fence. *See Oconomowoc*, 300 F.3d at 784 ("In other words, the plaintiffs must show that without the required accommodation they will be denied the equal opportunity to live in a residential neighborhood.").

Terence and Tonca Watters have failed to provide sufficient evidence to allow a reasonable trier of fact to conclude that the fence is necessary. They state that Terence Watters needs a privacy fence because of his PTSD and lung condition. However, Plaintiffs have not come forward with admissible testimony showing that such is the case. This Court cannot consider the hearsay testimony regarding statements allegedly made by Terence Watters's therapists. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) ("[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial."). Even if the Court considers Terence Watters's inadmissible hearsay testimony, it would be insufficient to show that the specific privacy fence requested was necessary. The alleged statement that a privacy fence would be "beneficial" does not show that the fence is "necessary." The statement does not indicate that the privacy fence requested by Terence and Tonca Watters would be more beneficial than the wrought-iron fence with landscaping or trees suggested by the

Board. And even if such a statement was offered, it would not be sufficient to show that the Watters's requested fence is necessary. *Cf. Smith v. Concentra, Inc.*, 240 F. Supp. 3d 778, 784–85 (N.D. Ill. 2017) ("A reasonable accommodation need not be an employee's preferred accommodation or the most beneficial accommodation for the employee; once the employer offers an alternative that reasonably accommodates the employee's [] needs the statutory inquiry is at an end.").[11]

This evidence combined with the fact that Terence Watters has lived in his home for several years without the requested fence illustrates that the denial of his request has not denied him an equal opportunity to enjoy the housing or community of his choice. *See Howard v. City of Beavercreek*, 276 F.3d 802 (6th Cir. 2002) (affirming summary judgment for defendant where plaintiff failed to show six-foot privacy fence was "necessary" for his PTSD given his treating physician only provided that the fence *may* relieve his undue stress). *See also Grubbs v. Hous. Auth. of Joliet*, No. 91 C 6454, 1997 WL 281297 (N.D. Ill. May 20, 1997) ("The record is devoid of medical evidence concerning the extent of plaintiff's back injuries or his need for ongoing hot bath treatments."). Terence and Tonca Watters have not provided any admissible medical evidence showing that a privacy fence is necessary because of Terence Watters's disability. While the privacy fence may have reduced some of the stress that Terence Watters is reportedly subjected to, the ACC's[12] denial of the privacy fence has neither excluded Terence and Tonca Watters from the neighborhood or residence of his choice, nor has it created less opportunity for

---

[11] The same analysis regarding reasonable accommodation applies across the FHA, Americans with Disabilities Act and the Rehabilitation Act. *Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 967 (7th Cir. 2018).

[12] Unless specified otherwise this section's references to the ACC/HOA Board are interchangeable since the evidence shows that some of Terence and Tonca Watters's communications went through the ACC and some went through the HOA Board.

Terence Watters to live in his neighborhood.

Moreover, the ACC provided a reasonable accommodation to the Watters's request for a privacy fence by stating that a wrought-iron fence as well as landscaping would be allowable. (Docket No. 57-9 at ECF p. 2). *See Stevens v. Hollywood Towers & Condominium Ass'n*, 836 F. Supp. 2d 800, 811 (N.D. Ill. 2011) (recognizing that if defendants offer a reasonable accommodation there can be no claim for interference with housing rights). Further, the ACC instructed Terence and Tonca Watters to submit alternative fence designs, but instead of taking that opportunity Terence and Tonca Watters filed this suit. (Docket No. 57-9 at ECF p. 2)

Terence and Tonca Watters cite *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) to argue that because there was a breakdown in the accommodation process there is a material issue of fact that cannot be resolved on summary judgment. In *Beck*, the Seventh Circuit discussed the requirements placed on employers and employees with respect to accommodation requests. The court noted:

> No hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility. For example, the cause of the breakdown might be missing information.

*Id.* at 1135–36.

The Watters's June 4, 2017, formal FHA request simply stated that Terence Watters was disabled and requested a privacy fence "for me to enjoy the full use of my property." (Docket No. 54-1 at ECF p. 58). Terence and Tonca Watters did not raise Terence Watters's PTSD in

this request and provided no information regarding the incident with a dog referenced in his deposition, his affidavit, and the Watters's summary judgment briefing. (Docket No. 54-1 at ECF pp. 26–27; Docket No. 57-6; Docket No. 54-1 at ECF p. 58; Docket No. 54-5 at ECF p. 14). In response to the Watters's request, the HOA Board declined the request for a privacy fence, but invited Terence and Tonca Watters to submit an alternative style of fence and recommended the use of landscape vegetation to enhance privacy. (Docket No. 54-1 at ECF pp. 59–60) ("The HOA is considerate of its members' privacy and recommends the use of landscape vegetation for privacy. If you wish to erect a fence, please submit an alternative style of fence for approval to the [ACC]"). Terence and Tonca Watters did not respond. Under these circumstances there is no material issue of fact with respect to who stopped the interaction that precludes summary judgment in favor of defendants.

Finally, the Plaintiffs have failed to provide sufficient evidence to allow a reasonable trier of fact to conclude that the defendants knew of Terence's disability that he alleges necessitated the accommodation. Claims based on alleged discrimination because of disability generally require a showing that the defendant knew of the disability. *See A.B. v. Hous. Auth. of S. Bend*, No. 3:11 CV 163 PPS, 2012 U.S. Dist. LEXIS 71016 at *22 (N.D. Ind. May 18, 2012). While some of the defendants, such as Mike Ullery, had general knowledge of Terence Watters's respiratory condition (Docket No. 54-5 at ECF p. 9), this general knowledge has no logical connection to the request for a privacy fence. Terence and Tonca Watters provided substantial testimony during discovery regarding Terence Watters's fear of dogs, yet they did not provide this information to the Defendants at the time the request was made. (Docket No. 54-1 at ECF p. 27). Terence and Tonca Watters simply said that Terence Watters was disabled and wanted a

privacy fence.[13]

This case is distinguishable from *Hollis v. Chestnut Bend Homeowner's Ass'n*, 2014 WL 4446834 (M.D. Tenn. Sept. 10, 2014), a non-binding case relied on by the Plaintiffs, in several material aspects. In *Hollis* the plaintiffs' requested house modification included metal roofing, which the physical therapist had indicated would provide plaintiffs' handicapped children additional sensory benefits that the defendants' proposed-shingle roof would not provide. *Id.* at *8. Moreover, metal roofing was listed as an acceptable material for roofing, was already used by at least one member of the community, and the approving body had already communicated to the plaintiffs would be permissible. Here, Terence and Tonca Watters have not provided sufficient evidence regarding necessity, the fencing has not previously been used in the manner Terence and Tonca Watters intend to use it, and the fencing has not been explicitly listed as an acceptable material by the HOA Board or the ACC. Notably, the plaintiffs in *Hollis* moved out of the neighborhood shortly after their modification was denied. *Id.* at *3. These are just a few of the reasons that court's denial of defendants' summary judgment is inapplicable to the instant case.

Absent evidence that would allow a reasonable jury to conclude that the privacy fence requested was both a necessary and reasonable accommodation, Terence and Tonca Watters

---

[13] In the Watters's response brief they indicate that, *after* defendants filed their motion for summary judgment Terence and Tonca Watters provided medical records referencing his PTSD and lung condition. (Docket No. 57-7). The unredacted portions of this medical record, dated May 11, 2017 (well after Terence and Tonca Watters first requested the privacy fence) in no way references any accommodations that Terence Watters needs. Relatedly, Terence and Tonca Watters cite two non-binding cases (one of which was also unpublished) for the proposition that medical testimony is not required to establish a disability and a person's testimony is enough to establish a material question of fact. (Docket No. 57 at ECF p. 17). Nevertheless, the Watters's argument misses the point that even if the Court assumes the disabilities and that they were known to Defendants, Terence and Tonca Watters have failed to provide sufficient evidence to create a question of fact that those disabilities make the privacy fence a necessity.

cannot succeed on their accommodation claim, and the Defendants are entitled to summary judgment on the Watters's 42 U.S.C. § 3617 accommodation claim.

**C.  42 U.S.C. § 1982**

42 U.S.C. § 1982 states "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C § 1982. "To state a claim under § 1982, plaintiffs must allege that the defendant had a racial animus, intended to discriminate against the plaintiff, and deprived the plaintiff of protected rights because of the plaintiff's race." *Whisby-Myers v. Kiekenapp*, 293 F. Supp. 2d 845, 850 (N.D. Ill. 2003). The Court need not discuss the Watters's § 1982 claim separately, because that claim, like the FHA claims, will survive only if the record demonstrates triable issues of fact on intentional discrimination. *See Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996).

### IV.    CONCLUSION

For the foregoing reasons, the Watters's claims against all defendants fail as a matter of law. Defendants' *Motion for Summary Judgment* is **GRANTED**.

**SO ORDERED** this 19th day of November 2019.

_____
Matthew P. Brookman
United States Magistrate Judge
Southern District of Indiana

Service will be made electronically on all ECF-registered counsel of record via email generated by the court's ECF system.