# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## NOTICE OF ISSUANCE OF MANDATE

October 4, 2022

To:  Roger A. G. Sharpe
     UNITED STATES DISTRICT COURT
     Southern District of Indiana
     United States Courthouse
     Indianapolis, IN 46204-0000

| | |
|---|---|
| No. 19-3499 | TONCA WATTERS and TERENCE WATTERS,<br><br>Plaintiffs - Appellants<br><br>v.<br><br>HOMEOWNERS ASSOCIATION AT THE PRESERVE AT BRIDGEWATER, et al.,<br><br>Defendants - Appellees |

| Originating Case Information: |
|---|
| District Court No: 1:18-cv-00270-MPB-JMS |
| Southern District of Indiana, Indianapolis Division |
| Magistrate Judge Matthew P. Brookman |

Herewith is the mandate of this court in this appeal, along with the Bill of Costs, if any. A certified copy of the opinion/order of the court and judgment, if any, and any direction as to costs shall constitute the mandate.

RECORD ON APPEAL STATUS:                    No record to be returned

form name: **c7_Mandate**    (form ID: **135**)

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT



Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

**FINAL JUDGMENT**



CERTIFIED COPY

September 12, 2022

Before

FRANK H. EASTERBROOK, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

CANDACE JACKSON-AKIWUMI, *Circuit Judge*

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

| | |
|---|---|
| No. 19-3499 | TONCA WATTERS and TERENCE WATTERS,<br>Plaintiffs - Appellants<br><br>v.<br><br>HOMEOWNERS ASSOCIATION AT THE PRESERVE AT<br>BRIDGEWATER, KATHRYN MAMARIL, and EDWARD MAMARIL,<br>Defendants - Appellees |

| **Originating Case Information:** |
|---|
| District Court No: 1:18-cv-00270-MPB-JMS<br>Southern District of Indiana, Indianapolis Division<br>Magistrate Judge Matthew P. Brookman |

The Watters have presented sufficient evidence to try their claims against the Mamarils under the FHA and § 1982 before a jury. They do not, however, provide any evidence directly linking the Mamarils' actions to the HOA as a whole, nor do they provide any evidence to support their failure to accommodate claim. We, therefore, AFFIRM the district court judgment as to the HOA and almost all of the individual defendants, but VACATE the judgment as to the Mamarils on the FHA and § 1982 claims, and REMAND for further proceedings consistent with the opinion.

The above is in accordance with the decision of this court entered on this date. Each side to bear their own costs.

Clerk of Court

CERTIFIED COPY

A True Copy
Teste:



Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

———————————————

No. 19-3499

TONCA WATTERS and TERENCE WATTERS,

*Plaintiffs-Appellants*,

*v.*

THE HOMEOWNERS' ASSOCIATION AT THE PRESERVE AT
BRIDGEWATER, KATHRYN MAMARIL, and EDWARD MAMARIL,

*Defendants-Appellees*.

———————————————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:18-cv-00270-MPB-JMS — **Matthew P. Brookman**, *Magistrate Judge*.

———————————————

ARGUED JUNE 2, 2022 — DECIDED SEPTEMBER 12, 2022

———————————————

Before EASTERBROOK, ST. EVE, and JACKSON-AKIWUMI, *Circuit Judges*.

JACKSON-AKIWUMI, *Circuit Judge*. Tonca and Terence Watters, a married black couple, chose to build their dream home in the Preserve at Bridgewater, a subdivision of Kokomo, Indiana. What they found were neighbors who made it clear from the beginning that they did not want the Watters to live there. The Watters sued the Homeowners' Association and

several of its members, including the former and current president of the HOA, Kathryn and Edward Mamaril, for race discrimination and failure to accommodate Terence's post-traumatic stress disorder under the Fair Housing Act and 42 U.S.C. § 1982. The district court granted summary judgment in favor of all defendants on all counts. We now vacate the court's judgment as to the Fair Housing Act and 42 U.S.C. § 1982 claims against the Mamarils, but otherwise affirm.

**I**

We summarize the facts based on the record, drawing all reasonable factual inferences in the light most favorable to the Watters as the party that did not move for summary judgment. *See Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 485 (7th Cir. 2015) (citation omitted). The Watters are an African-American couple who own two lots in the Preserve at Bridgewater. When they bought their lots in June 2013 and when they moved in after building their home in December 2015, they were the only black couple in the Preserve.

From the very beginning, the Watters had several run-ins with another married couple, Ed and Kate Mamaril. Kate was the president of the HOA when the Watters initially bought their property. She remained president until the summer of 2015, when her husband took over the presidency. Ed holds this position to this day. Kate has had no other role in the HOA.

Conflict with the Mamarils ignited as soon as the Watters began construction on their home: Ed told the Watters that they were not welcome, called them "assholes," asked why "you people" moved here, told them he had them investigated, and suggested they live "somewhere else."

The Maramils' cats also roamed the Watters' property without limit. Even though the HOA had covenants prohibiting pets from roaming free—and there was an applicable city ordinance too—the HOA refused to intervene when the Watters requested enforcement. The Watters suggest in their brief that the HOA enforced this covenant on behalf of a white homeowner, but they do not cite to any evidence in the record to support this. Moreover, Terence testified multiple times that he was not aware of any time the HOA enforced the pet covenant for anyone's property. In any event, given the cat problem, the Watters contacted the Humane Society. The Humane Society caught several cats on the Watters' property and fined the Mamarils for allowing their cats to roam freely. When someone from the Humane Society was speaking with Tonca on her own property, Kate approached Tonca and called her a "black bitch" and a "black n-----."

The final confrontation between the families occurred at the local Cracker Barrel, just outside of the Preserve's boundaries, in June 2017. When the Watters were at the restaurant with their daughter and two grandchildren, the Mamarils pushed them, and Kate referred to the grandchildren as "little monkey n------". The Mamarils then sought a protective order against Tonca, which prevented her from attending HOA meetings, but the Mamarils later withdrew the underlying petition.

Beyond the Mamarils, the Watters had a series of conflicts with the HOA. Although new homeowners should ordinarily receive copies of the HOA's restrictive covenants from their realtor or the seller, Kate, who was not on the HOA board at the time, offered to provide copies of the covenants to homeowners, neighbor-to-neighbor. But when the Watters asked

for copies of the HOA's restrictive covenants, Ed as HOA president refused to provide copies, even after the Watters made requests through an attorney. The Watters also asked to move their mailbox to the same side of the street as their home, but Ed threatened litigation if they did. White families moved their mailboxes without authorization, but the post office moved them back six months to a year later. The Watters were told to position their porch posts a certain way and were informed that they could not paint their house the same color as other nearby houses.[1] The record, however, does not reflect that white homeowners were allowed to position their porch posts or paint their houses however they pleased.

The Watters' largest dispute with the HOA centered around a privacy fence. The HOA has a rule against privacy fences; only pool safety fences and decorative landscaping fences are allowed. The Watters allege that a white resident built a garden fence without permission. The Watters also suggest that the HOA granted an exception to another white resident to build a six-foot cedar fence to safeguard his dogs. The record reflects that this resident possibly built his fence before the HOA existed (though the record is unclear when the HOA was created), and later submitted a plan for approval of the fence.

---

[1] The Watters make other allegations including that a neighbor parked his trailer in front of his own property in violation of the HOA's covenants; when they emailed the HOA about a person urinating and defecating on their property, only one HOA member responded; and when they emailed the HOA about the indecent exposure and, separately, a burglary, the HOA did not send out a mass email even though it did send out mass emails about a lost puppy and a car break-in.

No. 19-3499                                                                 5

The privacy fence issue arose because Terence is a veteran who was diagnosed with PTSD after being trapped in a cave, with a dog, behind enemy lines. Seeing dogs causes him emotional and physical distress. He is also unable to work and perform certain manual tasks because of a terminal lung condition. The lung condition further exacerbates his reactivity to dogs. Terence states that his doctors advised him to get a privacy fence to mitigate his PTSD triggers.

Without mentioning his disability, Terence initially requested a six-foot tall vinyl privacy fence that obstructed the view of his backyard. The HOA denied the request. Terence then requested the privacy fence as a reasonable and necessary accommodation. Terence had previously told the HOA, Ed Mamaril, a committee of the HOA called the Architectural Control Committee ("ACC"), and two ACC members, Mike Ullery and Randy Lindgren, about his lung condition. In his accommodation request, however, he did not mention his lung condition or his PTSD; he stated only that the Fair Housing Act prohibits disability discrimination. Terence says that he would have provided more information to the HOA about his disability, but they did not ask.

In response to Terence's accommodation request, the HOA wrote: "The Fair Housing Act does not pertain to your request for a privacy fence due to disability." The HOA rejected the request and suggested alternatives, such as a wrought iron fence or landscaping to create a sense of privacy. The HOA also stated that the Watters could submit an alternative style of fence for approval.

For its part, the ACC stated that the Watters needed to build a pool to have a fence. The Watters submitted plans for a pool. The Watters assert in their brief that the ACC

approved the plans before construction began, but Terence
could not recall in his deposition if the plans had been ap-
proved. Ed and other members of the ACC testified that the
plans were not approved before construction began. On the
day of installation, the ACC members, including Ed, physi-
cally prevented ground-breaking on the pool construction be-
cause they claimed that the plans had not been approved. But
they reviewed the plans onsite, approved them, and allowed
construction to begin the same day.

The Watters sued the HOA and its members, including the
Mamarils. The parties agreed to have a magistrate judge de-
cide the case, and defendants moved for summary judgment.
The magistrate judge granted summary judgment in favor of
all defendants on all claims. The Watters appeal with respect
to only the HOA and the Mamarils.[2]

## II

We review summary judgment decisions de novo and
draw all reasonable factual inferences in the light most favor-
able to the non-moving party. *Riley v. City of Kokomo*, 909 F.3d
182, 187 (7th Cir. 2018) (citation omitted). A motion for sum-
mary judgment is granted if the record shows there is "no
genuine issue as to any material fact and that the moving
party is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(c). "The mere existence of *some* alleged factual dispute

---

[2] The magistrate judge determined that the Watters did not provide any
argument or evidence for the claims against most of the individuals they
sued, including Randy Lindgren, Cherilyn Shook, David Barber, and
Chris Monroe. The Watters do not raise any issue with the judgment as to
these individuals, nor do they contest the judgment as to Mike Ullery.
Therefore, we affirm the judgment as to all claims against these five indi-
viduals, which leaves only the HOA and the Mamarils.

… will not defeat an otherwise properly supported motion for summary judgment." *East-Miller v. Lake Cnty. Highway Dep't*, 421 F.3d 558, 562 (7th Cir. 2005). On the other hand, "if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,'" that creates a genuine factual dispute. *Alston v. City of Madison*, 853 F.3d 901, 910–11 (7th Cir. 2017) (citation omitted).

The Watters allege two claims of race discrimination against the HOA and the Mamarils—one under the Fair Housing Act, *see* 42 U.S.C. § 3617, and another under 42 U.S.C. § 1982, which guarantees equal property rights to all citizens. The Watters allege a third claim against only the HOA for failure to accommodate Terence's PTSD with a privacy fence; this claim arises under Fair Housing Act too. *See* 42 U.S.C. § 3604(f)(3)(B). We take each claim in turn.

### A

The Watters' first claim against the HOA and the Mamarils is for race discrimination under the Fair Housing Act.[3] Two sections of the FHA are key to this claim. First, § 3604(a) explicitly prohibits making housing "unavailable" based on the potential renter or buyer's race or color. 42 U.S.C. § 3604(a). Second, § 3617 prohibits coercion, intimidation, threats, or interference with "any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section [3604] of this title." 42 U.S.C. § 3617. Both

---

[3] At oral argument, the Watters conceded that they did not plead a hostile housing environment claim under §§ 3604(b), 3617. *See Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 861–62 (7th Cir. 2018).

§ 3604(a) and § 3617 reach post-acquisition conduct, not just
the initial sale or rental of housing. *Bloch v. Frischholz*, 587 F.3d
771, 782 (7th Cir. 2009) (en banc). The rights under § 3604(a)
that § 3617 protects from interference include post-sale activ-
ity "that makes a dwelling unavailable to the owner or tenant,
somewhat like a constructive eviction." *Id*. at 776. Such post-
sale activity includes "*attempted* discriminatory evictions" by
interfering with an individual's § 3604(a) rights—even if the
plaintiff does not actually vacate the premises. *Id.* at 782.

Plaintiffs need not invoke a specific right under § 3604 in
order to bring a § 3617 claim. This is *Bloch*'s very holding. In
holding that rights under § 3604(a) can cover post-acquisition
conduct, the en banc court stated that § 3617 "reaches a
broader range of post-acquisition conduct" than § 3604(a). *Id.*
After all, if § 3617 were entirely circumscribed by § 3604(a),
there would be little, if any, conduct that would not simulta-
neously violate § 3617 and the underlying statute. Such a nar-
row reading of § 3617 would render the statute useless. The
en banc court in *Bloch* recognized this and therefore under-
stood the statute to reach conduct outside the specific confines
of § 3604(a). *See id*. At 781–82 (recognizing the Blochs had
§ 3617 claim even though they did not have a constructive
eviction claim under § 3604(a) because "[t]o hold otherwise
would make § 3617 entirely duplicative of the other FHA pro-
visions.").

A § 3617 discrimination claim is comprised of four ele-
ments: "(1) [the plaintiff is] a protected individual under the
FHA, (2) [they were] engaged in the exercise or enjoyment of
[their] fair housing rights, (3) the defendants coerced, threat-
ened, intimidated, or interfered with the plaintiff on account
of [their] protected activity under the FHA, and (4) the

defendants were motivated by an intent to discriminate." *Id.*
at 783 (citations omitted). Everyone agrees that the Watters
satisfy the first two elements: they are black and live in the
home they own in the Preserve.

The parties slightly disagree about the fourth element, the
scope of the intent to discriminate. The Watters point to three
examples to show intentional discrimination: (1) Ed Mamaril
asking the Watters why "you people" chose to move to the
Preserve and stating that they should have moved some-
where else; (2) Kate Mamaril calling Tonca a "black bitch" and
a "black n-----" when the Humane Society picked up the
Mamaril's cats; and (3) Kate Mamaril calling the couple's
grandchildren "little monkey n------." The HOA and the
Mamarils do not dispute that Kate's repeated, flagrant use of
racial epithets establishes discriminatory intent. After all, ra-
cial slurs are direct evidence of intentional discrimination. *See
East-Miller*, 421 F.3d at 563 n.2. Instead, the HOA and the
Mamarils argue that Ed's "you people" comment only re-
ferred to the Watters as a specific family and did not speak to
their race. But the record does not indicate that Ed had any
previous interactions with the Watters before they moved in.
Rather, the record reflects that Ed saw the first black couple
who chose to live in the Preserve and told them that "you peo-
ple" should live somewhere else.[4] Moreover, based on his

---

[4] The dissent suggests that we cannot infer that Ed's use of the phrase "you
people" referred to the Watters' race because there is no surrounding con-
text that suggests his comment referenced the Watters' race. Putting aside
the fact that Kate's repeated use of the N-word provides such additional
context, the dissent ignores the fact that the phrase "you people" is well-
recognized racial code in our society. *See, e.g.*, Leora F. Eisenstadt, *The N-
Word at Work: Contextualizing Language in the Workplace*, 33 Berkeley J.

wife's blatant racist comments, a reasonable factfinder can in-
fer in the light most favorable to the Watters—as we must do
at the summary judgment stage—that Ed's "you people"
comment carried the stain of racial animus.[5] The Watters have
supplied enough evidence to satisfy the fourth element at this
stage of the case.

The core of the parties' dispute however, is the third ele-
ment: whether any of the Mamarils' or the HOA's conduct in-
terfered with the Watters' housing rights. After all, isolated
acts of racial animus are not enough; there must be "'some
nexus' between [a stray] remark and the challenged" action.

---

Employment & Labor L. 299, 329–32 (2012) (discussing how courts some-
times ignore the racist connotation of "you people"); *cf. Aman v. Cort Fur-
niture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996) ("Discrimination con-
tinues to pollute the social and economic mainstream of American life, and
is often simply masked in more subtle forms. It has become easier to coat
various forms of discrimination with the appearance of propriety, or to
ascribe some other less odious intention to what is in reality discrimina-
tory behavior."). We do not suggest that a single utterance of "you people"
alone can support a claim of race discrimination, but we cannot be blind
to the realities illustrated above when evaluating a litigant's argument.

[5] From the Watters' complaint through their briefing on appeal, they have
argued that the Mamarils engaged in a coordinated pattern of harassment.
As joint tortfeasors, we consider the Mamarils' conduct as a whole.
*See Curtis v. Loether*, 415 U.S. 189, 195 (1979) ("A damages action under [the
FHA] sounds basically in tort—the statute merely defines a new legal
duty, and authorizes the courts to compensate a plaintiff for the injury
caused by the defendant's wrongful breach. … [T]his cause of action is
analogous to a number of tort actions recognized at common law."); Re-
statement (Second) of Torts, § 875 ("Each of two or more persons whose
tortious conduct is a legal cause of a single and indivisible harm to the
injured party is subject to liability to the injured party for the entire
harm").

*See Scaife v. Cook Cnty.*, 446 F.3d 735, 741 (7th Cir. 2006), *over-ruled on other grounds*, *Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013) (describing same requirement under Title VII).

The HOA and the Mamarils first argue that the Watters cannot point to any specific right under § 3604(a) that was violated by the Mamarils' conduct. But, as explained earlier, a claim under § 3617 does not require a specific violation of a right under § 3604. *Bloch*, 587 F.3d at 782. Instead, § 3617 prohibits the coercion, intimidation, threats, or interference with those rights. *See id.* (holding that, under § 3617, "[c]oercion, intimidation, threats, or interference with or on account of a person's exercise of his or her §§ 3603–3606 rights can be distinct from outright violations of §§ 3603–3606."). The Mamarils' repeated use of racist language is the quintessential example of interference that establishes "a 'pattern of harassment, invidiously motivated.'" *Id.* at 783. Such a pattern of racially based harassment can function as an attempted constructive eviction, even if the Watters remained at their property.[6] *See id.* at 782 ("Though § 3604 [on its own] requires that the plaintiffs' dwelling be made truly unavailable, or that defendants deprived plaintiffs of their privilege to inhabit their dwelling, the text of § 3617 is not so limited."); *id.* (holding that § 3617 applies to "post-acquisition discrimination that

---

[6] The HOA and the Mamarils make the incredible claim that the Watters' FHA race discrimination claim should fail because "they continue to reside in [t]he Preserve[] to this day." The fact that the Watters chose to remain on the property they purchased, in the home that they built, despite the Mamarils' conduct cannot vitiate the Watters' claim. In the HOA and the Mamarils' view, the only way plaintiffs can succeed on a discrimination claim under § 3617 is when the treatment is so bad that they are physically dispossessed of their property and run out of town. Our case law logically does not condone such a rule. *See Bloch*, 587 F.3d at 781–82.

does not result in eviction" because such a construction is "consistent with Congress's intent in enacting the FHA" and because the Housing and Urban Development regulations prohibit "interfering with persons in their enjoyment of a dwelling because of the race … of such persons").

Stated otherwise, a reasonable factfinder could conclude that the Mamarils' pattern of harassment interfered with the Watters' post-acquisition enjoyment of their property, even if the Mamarils could not or did not actually force the Watters to leave. After all, the Mamarils' harassment of the Watters went directly to the Watters' choice to live at the Preserve: the Mamarils told them that "you people" should live elsewhere and the mere prospect of their moving into the subdivision warranted an investigation into their background. The harassment reemerged when the Watters called the Humane Society after the Mamarils' cats repeatedly entered their property, in violation of the neighborhood covenants. Even when the Watters tried to enjoy a meal just outside their home with their family, the Mamarils continued their racialized harassment.

As support for their contrary position, the HOA and the Mamarils rely on *Walton v. Claybridge Homeowners Association, Inc.*, an unpublished case that involved a single, indirect racist statement that the plaintiff merely overheard. 191 F. App'x 446, 451 (7th Cir. 2006). The Mamarils, by contrast, made three blatant and racially hostile statements directly to the Watters. Thus, *Walton* not only carries no precedential weight but is also clearly distinguishable.

The HOA and the Mamarils next suggest that the incidents involving the Mamarils' insults and epithets are simply personal in nature and have no relationship to the Watters'

housing. They point out, for example, that Kate was not a
member of the HOA board at the time she made her com-
ments. And they note that Kate's first use of the N-word was
when Tonca called the Humane Society about the Mamarils'
cats, which had nothing to do with the HOA. Lastly, they as-
sert that the incident at Cracker Barrel did not occur in the
neighborhood or at an HOA function.

The problem with this argument is that it ignores the for-
est for the trees. While it is true that isolated incidents of racial
slurs may not be enough on their own, this case involves the
same defendant making two separate uses of one of the most
horrendous slurs in our language, and her husband adding
his own racially hostile innuendo. Add to this that the
Mamarils are the president and former president of the HOA.
These titles clothe the Mamarils with a certain power at the
Preserve—even if one can debate the depth of that power. To
be sure, a defendant's title alone does not absolve plaintiffs
from proving the elements of their claims. But as in Title VII
cases where we consider a supervisor's harassing conduct
more serious than that of a co-worker, *Gates v. Bd. of Educ.*, 916
F.3d 631, 638 (7th Cir. 2019), it stands to reason that the be-
havior of a defendant who exercises authority over a plain-
tiff's housing rights would also bear more consideration in a
fair housing case. *See Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222
F.3d 289, 295 (7th Cir. 2000) (citations omitted) ("Courts have
recognized that [the FHA] is the functional equivalent of Title
VII, and so the provisions of these two statutes are given like
construction and application."); *DiCenso v. Cisneros*, 96 F.3d
1004, 1008 (7th Cir. 1996) ("[W]e recognize a hostile housing
environment cause of action [under the FHA], and begin our
analysis with the more familiar Title VII standard."). A rea-
sonable factfinder can infer that being treated with racial

disdain and hostility by the head of the HOA and his wife, who herself held the same position only recently, can directly affect how safe a family feels in their own home. More importantly, as discussed above, a reasonable factfinder can infer that the Mamarils' repeated harassment undermined the Watters' ability to enjoy the basic living conditions one expects when they purchase a home.[7] *See Bloch*, 587 F.3d at 782.

To be sure, interference under § 3617 does not cover "a 'quarrel among neighbors' or an 'isolated act of discrimination,' but rather [] a 'pattern of harassment, invidiously motivated.'" *Id.* at 783 (citation omitted). But this is no simple quarrel among neighbors, and the Watters are not trying to use federal law to police general decorum in the neighborhood. The record shows that Kate and Ed Mamaril used racial slurs and epithets against the Watters ever since they first stepped foot in the Preserve. One cannot avoid liability by

---

[7] The dissent argues that there is a lack of a nexus between the Mamarils' conduct and the Watters' rights under the FHA and points to a Sixth Circuit case, *Linkletter v. Western & Southern Financial Group, Inc.*, 851 F.3d 632 (6th Cir. 2017). But *Linkletter* demonstrates that "the language of § 3617 should be broadly interpreted and applied with the Fair Housing Act's purpose in mind." *Id.* at 637 (citations omitted). There, the Sixth Circuit held that a woman who was terminated from her job after signing a petition supporting a women's shelter that was engaged in a land dispute with her employer could pursue a § 3617 claim based on the theory that she "aided and encouraged" the housing rights of the shelter's residents. *Id.* at 638–40. In fact, the dissent omits a key qualifier when quoting *Linkletter* that highlights the flexibility of causation in these claims: "Section 3617 requires a nexus with the rights protected by §§ 3603-06, *without requiring an actual violation of the underlying provisions.*" *Id*. at 639 (emphasis added) (citation omitted); *see also Bloch*, 587 F.3d at 781–82 (although defendants did not violate § 3604(a), plaintiffs could still pursue claim under § 3617).

No. 19-3499                                                                 15

taking a film reel exhibiting harassment, slicing the reel into
individual frames, and presenting them as mere isolated acts.
The evidence here is enough that the Watters may present
their claim against the Mamarils to a jury. *See Alston*, 853 F.3d
at 910–11.

All that said, there is a key omission in the Watters' evi-
dence: The three incidents at issue involve the Mamarils only
in their individual capacities. While they hold the title of pres-
ident and former president of the HOA, the Watters do not
provide any evidence that the Mamarils were acting on behalf
of the HOA when they made any of the statements. As such,
the Watters cannot provide any evidence of the HOA's dis-
criminatory intent or interference in their FHA rights. The
Watters also attempt to point to certain circumstantial evi-
dence or rely on the burden-shifting *McDonnell Douglas* test
to establish a prima facie case of housing discrimination
against the HOA, *see McDonnell Douglas Corp. v. Green*, 411
U.S. 792 (1973), but to no avail. For example, the Watters al-
lege that they were treated differently than their white coun-
terparts with respect to the pet covenants, the pool construc-
tion, the distribution of copies of the HOA restrictive cove-
nants, the placement of the mailboxes, the paint color of their
home, and the privacy fence. But the record is either silent or
directly contradicts them on each of these issues. Therefore,
the Watters can proceed with their race discrimination claim
under the FHA against the Mamarils, but not against the
HOA.

## B

The Watters also bring a claim under 42 U.S.C. § 1982 for
race discrimination. Section 1982 provides that "[a]ll citizens
of the United States shall have the same right, in every State

and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. A claim under § 1982 and the FHA both require proof of an intent to discriminate, so the two claims often rise and fall with each other. *See Bloch*, 587 F.3d at 783. Here, because the Watters have sufficient evidence as to the Mamarils' intent to discriminate based on race but not as to the HOA, they may only pursue a § 1982 claim against the Mamarils.

## C

Finally, the Watters allege that the HOA violated the FHA by failing to accommodate Terence's PTSD in the denial of the Watters' request for a privacy fence. To pursue a failure to accommodate claim under 42 U.S.C. § 3604(f)(3)(B), a plaintiff must plead elements that match those required under the Americans with Disabilities Act: (1) the plaintiff had a disability; (2) the defendant was aware of disability; and (3) the defendant failed to reasonably accommodate the disability. *Geraci v. Union Square Condo Ass'n*, 891 F.3d 274, 277 n.1 (7th Cir. 2018) (citation omitted).

The Watters' claim fails because they cannot satisfy the second element regarding the HOA's knowledge. The parties agree that Terence told one HOA member about his lung condition, but the Watters do not provide any evidence that the HOA knew of his PTSD. In fact, Terence did not list his PTSD at all in his accommodation request. And it is his PTSD, not his lung condition, that the Watters say formed the basis for Terence's accommodation request. Without any evidence showing that the HOA knew about Terence's PTSD, the Watters' failure to accommodate claim cannot survive.

No. 19-3499                                                            17

### III

The Watters have presented sufficient evidence to try their claims against the Mamarils under the FHA and § 1982 before a jury. They do not, however, provide any evidence directly linking the Mamarils' actions to the HOA as a whole, nor do they provide any evidence to support their failure to accommodate claim. We, therefore, AFFIRM the district court judgment as to the HOA and almost all of the individual defendants, but VACATE the judgment as to the Mamarils on the FHA and § 1982 claims, and REMAND for further proceedings consistent with this opinion.

18                                          No. 19-3499

St. Eve, *Circuit Judge*, dissenting in part. Tonca and Terence Watters were unfairly subjected to degrading and offensive comments by two of their neighbors, Kathryn and Edward Mamaril, on account of their race. But the Watters' two claims against the Mamarils, based on alleged violations of the Fair Housing Act and 42 U.S.C. § 1982, require a nexus between discriminatory treatment and an adverse housing action. Because such a connection is lacking, I would affirm across the board. Therefore, I respectfully dissent.

The facts here are fairly straightforward. The Preserve at Bridgewater is a housing development in Kokomo, Indiana. The Preserve is managed by the Homeowners Association, which includes an Architectural Control Committee. Kathryn Mamaril, a resident of the Preserve, served as HOA president until the summer of 2015, when Edward Mamaril, her husband, took over the position.

On December 22, 2015, the Watters, both of whom are black, moved into a home on the Preserve where they still reside. Soon after moving into their home, Edward Mamaril said he had investigated the Watters and asked, "Why did you people move here? You could have moved somewhere else," and told the Watters they were unwelcome. Twice, Kathryn Mamaril purportedly directed racist slurs at Tonca Watters. In March 2016, after Tonca called the Humane Society to trap Kathryn's cats on the Watters' property, Kathryn called Tonca a "black bitch" and a "black n-----," asked, "why the F [had she] moved out [there]," and said Tonca "was trouble and making her life miserable." In June 2017, Tonca and Kathryn got into an altercation at a nearby Cracker Barrel located outside the Preserve when either Kathryn or her daughter

No. 19-3499                                                          19

referred to Tonca's grandchildren, also in attendance, as "little
monkey n-----."[1]

The Watters filed suit against the HOA, the Mamarils, and
various other community members, asserting three causes of
action: race discrimination and failure to accommodate, both
in violation of 42 U.S.C. § 3617; and interference with prop-
erty rights, in violation of 42 U.S.C. § 1982. The district court
granted the defendants' motion for summary judgment on all
counts. The majority opinion affirms the award of summary
judgment for the claims against the HOA and all other resi-
dents listed in the original suit, but it reverses with respect to
the FHA and § 1982 claims against the Mamarils. In my opin-
ion, the record is devoid of evidence necessary to create a tri-
able issue of fact as to any cause of action. The district court
properly awarded summary judgment to the Mamarils.

Section 3617 of the FHA prohibits coercion, threatening, or
interference with the enjoyment of real property on the basis
of race. 42 U.S.C. § 3617 ("It shall be unlawful to coerce, intim-
idate, threaten, or interfere with any person in the exercise or
enjoyment of … any right granted or protected by section
3603, 3604, 3605, or 3606 of this title."); *see also* 24 C.F.R.
§ 100.400(c)(2) (proscribing "[t]hreatening, intimidating or in-
terfering with persons in their enjoyment of a dwelling be-
cause of the race … of such persons").[2] To maintain a § 3617

---

[1] Kathryn Mamaril denies referring to Tonca Watters as a "black bitch" or
a "black n-----" or to her grandchildren as "little monkey n-----." The Wat-
ters are entitled to the benefit of conflicting evidence on summary judg-
ment, so we presume the events unfolded as they describe. *Ziccarelli v.
Dart*, 35 F.4th 1079, 1083 (7th Cir. 2022).

[2] Section 1982 also guarantees that "[a]ll citizens of the United States …
the same right … as is enjoyed by white citizens thereof to inherit,

action, plaintiffs must demonstrate (1) they are protected in-
dividuals under the FHA, (2) they were engaged in the exer-
cise or enjoyment of their fair housing rights, (3) the defend-
ants coerced, threatened, or interfered with the plaintiffs on
account of their FHA-protected activity, and (4) the defend-
ants were motivated by an intent to discriminate. *Bloch v.
Frischholz*, 587 F.3d 771, 783 (7th Cir. 2009). The majority is un-
doubtedly correct that the Watters have satisfied the first two
elements, but their claims falter on the third element—coer-
cion, threatening, or intimidation with the plaintiffs' housing
rights on account of race.[3] It is hornbook law that even the
worst behavior toward one's neighbors requires some nexus
to an adverse housing action; otherwise, the claim is not ac-
tionable under the FHA. *Halprin v. Prairie Single Fam. Homes
of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004); *see also
Revock v. Cowpet Bay West Condominium Ass'n*, 853 F.3d 96,
112–13 (3d Cir. 2017) ("A Section 3617 interference claim re-
quires … a causal connection existed between the exercise or
enjoyment of the right and the defendant's conduct."); *Scaife
v. Cook Cnty.*, 446 F.3d 735, 741 (7th Cir. 2006) (applying the
nexus requirement in the Title VII context), *overruled on other
grounds*, *Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013).
Congress never intended "to convert every quarrel among

---

purchase, lease, sell, hold, and convey real … property." 42 U.S.C. § 1982.
I agree with the majority that "the two claims often rise and fall with each
other," as they do again here.

[3] The majority opinion states that the "parties slightly disagree about the
fourth element, the scope of the intent to discriminate." In my opinion, the
parties strongly disagree about the fourth element as well—but I focus on
the third element because it proves dispositive.

neighbors in which a racial or religious slur is hurled into a federal case." *Halprin*, 388 F.3d at 330.

Kathryn Mamaril twice directed racial slurs toward Tonca Watters, once in March 2016 and once in June 2017. Such language is unquestionably odious in every respect, but the Watters offer no evidence whatsoever linking these remarks to any protected use and enjoyment of their home or to any complained-of housing action. *See Linkletter v. Western & Southern Financial Group, Inc.*, 851 F.3d 632, 639 (6th Cir. 2017) ("Section 3617 requires a nexus with the rights protected by §§ 3603–06 ...."). The Cracker Barrel incident took place outside the Preserve. Kathryn Mamaril's leadership on the HOA ended before the Watters moved into the Preserve, and she had no role in either the HOA or the ACC after the summer of 2015. Simply because Kathryn at one point occupied a position of authority within the HOA does not, without more, perpetually imbue her actions or words with the weight of that stature once she stepped down from her position.[4] Moreover, the only two instances the Watters offer of Kathryn using racial epithets are separated by approximately fourteen months, a significant temporal lapse. Isolated acts of harassment without the requisite nexus cannot sustain the Watters' claims. *See Halprin*, 388 F.3d at 330; *Scaife*, 446 F.3d at 741.

The comment from Edward Mamaril proves similarly unhelpful. Edward approached Terence soon after moving to the

---

[4] The majority takes the contrary view, opining that "[t]hese titles clothe the Mamarils with a certain power at the Preserve." But this bold assertion lacks foundation in existing caselaw. Titles neither change the elements of an FHA claim nor relieve the plaintiffs of establishing a connection between coercion and an adverse housing action.

Preserve, said he "investigated" the Watters, and asked, "Why did you people move here? You could have moved somewhere else." Investigating new neighbors is certainly odd, but not federally actionable absent a connection to any housing consequence. The Watters identify none. Instead, they argue Edward referred specifically to their race in using the phrase "you people" such that it constituted a racial slur.[5] Again, however, the Watters fail to link this isolated comment to any adverse housing action. The Watters and the majority attempt to connect Edward's use of "you people" with Kathryn's use of "n-----." But we have never acknowledged a spouse-imputation theory, nor can the majority furnish any legal support for this imaginative position—and for good reason. Kathryn's language is attributable to her and her alone; Edward is not infected by his wife's racial animus by virtue of their marital bond.

The majority attempts to circumvent the lack of evidence by raising an argument the Watters never raised below: that a pattern of harassment "can function as an attempted constructive eviction." Putting the issue of waiver aside, the Watters have not presented sufficient evidence to prevail on this theory. Although we have recognized an attempted constructive

---

[5] We have only found the phrase "you people" to refer to race when accompanied by other racially charged language or acts. *See, e.g., Brewer v. Bd. of Trs. of Univ. of Il*, 479 F.3d 908, (7th Cir. 2007); *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 662, 665–66 (7th Cir. 2006). Other circuits treat the phrase similarly. *See, e.g., Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269–70 (3d Cir. 2010); *Umani v. Mich. Dep't of Corr.*, 432 F. App'x 453, 459 (6th Cir. 2011). With respect to Edward Mamaril, the Watters offered no such context supporting their preferred interpretation.

eviction claim under § 3617, *Bloch*, 587 F.3d at 782–83, that does not mean the evidence supports such a claim, even when viewed in the light most favorable to the Watters. In *Bloch*, a condominium association selectively enforced a hallway rule against Jewish residents who wished to hang mezuzot on their exterior doorposts. This court held that the plaintiffs could prevail on an attempted constructive eviction theory if they could show that such interference was intentionally discriminatory. *Id*. at 783. Crucially, the Blochs had evidence of a nexus between discrimination and a *housing* action: physically removing mezuzot from their doorposts. By contrast, two offensive remarks by Kathryn Mamaril over a fourteen-month period do not amount to attempted constructive eviction, especially where one of the alleged remarks was not made on or near the property. *See Halprin*, 388 F.3d at 330 (Congress did not intend "to convert every quarrel among neighbors in which a racial or religious slur is hurled into a federal case"). To hold otherwise would collapse any distinction between a neighbor's offensive speech and interference with housing rights.

The majority discounts the nexus requirement by accusing the Mamarils of "slicing" the facts and looking at them only in isolation. Viewed holistically, the majority can point to only two instances (over a year apart) where Kathryn used racial epithets, and Edward's single use of the phrase "you people." Without any link to an adverse housing action, the Watters' claims fail. Therefore, in my opinion, the district court properly awarded summary judgment in favor of Mamarils. I respectfully dissent.